

DA 06-0780

## IN THE SUPREME COURT OF THE STATE OF MONTANA

### 2008 MT 268

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

JAYMIE LAWRENCE McMASTER,

      Defendant and Appellant.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. DC-2006-43(B)
Honorable Jeffrey M. Sherlock, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Wendy Holton, Attorney at Law, Helena, Montana

          James B. Wheelis, Appellate Defender's Office, Helena, Montana

      For Appellee:

          Hon. Mike McGrath, Attorney General; John Paulson, Assistant Attorney General, Helena, Montana

          Leo J. Gallagher, Lewis and Clark County Attorney, Helena, Montana

          Submitted on Briefs:  June 20, 2008

                    Decided:  August 4, 2008

Filed:

          _____
                      Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1 Jaymie Lawrence McMaster (McMaster) appeals from an order of the First Judicial District Court, Lewis and Clark County, requiring him to pay restitution in the amount of $30,000. We affirm.

¶2 We review the following issue on appeal:

¶3 *Did the District Court abuse its discretion when it determined McMaster's restitution obligation based in part upon testimony given at the restitution hearing?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 Dennis Wright (Wright) bought Crossroads Sports and Fitness (Crossroads), a health club located in Helena, Montana, in 1997. Wright's accountant described Crossroads as a "cash cow" and considered the club a good investment for Wright. Wright hired McMaster as the general manager in 2000 to help run the club's operations. Wright hired Teresa Whitney (Whitney) a short time later to serve as the club's business manager.

¶5 Crossroads encountered serious financial difficulty late in 2002. The club lost large amounts of money from 2002 to 2005. Wright invested an additional $250,000 during this period to stave off bankruptcy.

¶6 Valley Bank of Helena contacted Wright late in 2005 concerning Crossroads' account with the bank. The bank recently had installed fraud detection software. The software program had flagged the Crossroads account as a possible victim of fraudulent activity. Wright learned from the bank that a significant amount of unauthorized and

unusual account activity had occurred. Wright filed a report of potential embezzlement and internal theft with Helena Police Detective Russ Whitcomb.

¶7 Detectives Whitcomb and Mark Ekola and Agent Wade Cooperider began an investigation of Wright's allegations. They accompanied Wright to Crossroads' offices to collect evidence and to speak with McMaster. McMaster admitted that he had done things "which were not right," but did not admit to having stolen money from Crossroads at that time. Detective Whitcomb estimated that Wright had suffered a loss of approximately $66,000 at the conclusion of his investigation. The State filed embezzlement charges against both McMaster and Whitney.

¶8 Whitney pled guilty to the theft of property by embezzlement. She received a three year deferred imposition of sentence and a restitution obligation of $18,945.88. McMaster pled guilty to theft of property by embezzlement on May 11, 2006.

¶9 Probation Officer Michael Touchette prepared a Pre-sentence Investigation Report (PSI) for the court. The PSI documented McMaster's assets as a moderate income, a house, two vehicles, and a supplemental income from his wife. The PSI did not include an affidavit submitted by Wright that described his pecuniary loss, but it did refer to statements submitted by Wright concerning his estimation of an appropriate amount for restitution. The PSI outlined the circumstances of McMaster's embezzlement activities and the various methods used by McMaster to steal funds. The PSI recommended that the court set McMaster's restitution obligation at $12,914.46. The probation officer filed the PSI and delivered it to the State on August 22, 2006--two days before the restitution

3

hearing.

¶10 The District Court held a restitution hearing on August 24, 2006, and continued the hearing for a second day on September 6, 2006. Wright submitted a written statement concerning the funds embezzled by McMaster fifteen minutes before the start of the hearing on August 24, 2006. Wright testified on both days of the hearing. McMaster cross-examined Wright on the first day of the hearing. McMaster also cross-examined Wright when the court re-convened the hearing nearly two weeks later on September 6, 2006.

¶11 Wright described the losses that Crossroads had incurred as a result of McMaster's activities. Wright "totally disagree[d]" with the restitution figure set forth in the PSI. Wright submitted a written summary of his alleged losses that varied with the calculations provided in the PSI. McMaster objected to the summary on the grounds that he had received the summary only minutes before the first day of the hearing. The State informed the court that it had received the PSI two days before the first day of the hearing. The State had asked Wright to prepare the summary in the interim to reflect his disagreement with the PSI's restitution figure. The District Court provided McMaster with the opportunity to request a continuation of the hearing or a delay in the imposition of McMaster's restitution. McMaster's counsel stated that she did not want to continue the hearing.

¶12 McMaster objected to witness testimony and estimates throughout the hearing based upon his late receipt, or non-receipt in some cases, of various financial documents.

4

The court offered on several occasions to continue the hearing if McMaster felt "disadvantaged" at the lack of timely access to Wright's financial records or if McMaster wanted more time to review the records or to obtain additional records.

¶13 Wright's summary included two different restitution calculations. Wright first employed a cash-flow analysis that compared the club's cash-flow and account balance from the period after McMaster left Crossroads to the club's finances during the time that McMaster had embezzled funds. The analysis assumed that no significant improvements or changes had occurred in Crossroads' operating procedures. The analysis concluded that the club should have netted a positive balance of $105,000 for each of the years that McMaster had embezzled funds. The analysis presented a total restitution recommendation of $334,425--the projected net balance multiplied by the three years covered by the embezzlement charge against McMaster, plus accounting charges incurred in the investigation of the club's losses.

¶14 The summary presented by Wright included an alternate restitution calculation based upon Wright's calculations of lost funds. The summary contained nineteen categories of embezzlement activity, including improper cash withdrawals, illegitimate credit card charges, unauthorized "bonus" payments, and unauthorized trade-outs with other businesses. Wright highlighted in his testimony the areas that he believed the probation officer had failed to account in calculating the restitution. Wright calculated these amounts based on his own review of financial records, interviews with other Crossroads employees, and assumptions that he had made regarding the club's business.

Wright's alleged losses under this method of analysis totaled $231,693.

¶15    Leigh Ann West Simendinger (Simendinger) testified on behalf of the State. Simendinger is an accountant and an independent consultant who works with struggling businesses to improve their financial situations. Simendinger regularly employs cash-flow analyses in her consulting work. She supported the restitution calculation that Wright had presented using the cash-flow analysis. Simendinger testified that Wright's cash-flow analysis constituted a very conservative estimate of Crossroads' earning potential during McMaster's period of embezzlement.

¶16    David Johnson, an accountant hired by McMaster, testified on the second day of the hearing. The court qualified Johnson as an expert. Johnson testified that he had received and reviewed a copy of the written statement that Wright had submitted on the first day of the hearing. Johnson sought to discredit Wright's restitution figures. Johnson critiqued specific restitution claims in Wright's written statement as well as Wright's testimony regarding a cash-flow analysis. Johnson also discussed Simendinger's testimony concerning the cash-flow analysis. Johnson characterized the analysis as "irresponsible." Johnson testified that he would rely only upon "actual records" and would require the records to demonstrate a "direct benefit" to McMaster for any restitution calculation. Johnson later admitted that the available records appeared to reveal that McMaster had documented legitimate transactions, but McMaster had left no source documents with regard to any illegitimate transactions. He conceded that a cash-flow analysis would constitute a proper method for determining the restitution amount in

6

an embezzlement case when the "actual records" were known to be inaccurate and where an employee had skimmed cash from the business.

¶17 The probation officer who had prepared the PSI, Touchette, also testified at the hearing. The State challenged the analysis that Touchette had employed in preparing the PSI and challenged his final restitution calculations. Touchette testified that he and Johnson had reviewed Wright's claimed losses in detail and had "whittled that down to what we could actually prove the defendant put in his pocket . . . ." Touchette asserted that he would not provide a restitution figure without having "documentable" evidence that demonstrated the victim's losses with "absolute certainty." Touchette attributed the majority of Wright's losses to bad management choices made by McMaster.

¶18 The District Court received several restitution recommendations. The recommendations ranged from the $12,914 proposed by the probation officer, to $334,425 as set forth in Wright's cash-flow analysis. McMaster noted again at the conclusion of the hearing that he had not received Wright's written statement regarding Crossroads' losses until fifteen minutes before the first day of the hearing. McMaster argued that he had received no documents that supported Wright's written statement between the first day of the hearing on August 24, 2006, and the second day of the hearing on September 6, 2006. The State informed the court that neither the State, nor Wright, had received a request for additional records during the two weeks between the hearing dates. The court adjourned the hearing without imposing a sentence.

7

¶19 The court issued an order five days later on September 11, 2006, that found that the pecuniary loss to Wright consisted of $102,753, "at a minimum." The court found further, however, that McMaster could afford to pay only $30,000. The court set McMaster's restitution at $30,000 based upon this finding. McMaster appeals.

**STANDARD OF REVIEW**

¶20 We apply a two-tiered standard of review to a criminal sentence that does not qualify under statute for review by the Sentence Review Division because the sentence does not impose at least one year of actual incarceration. *State v. Herd*, 2004 MT 85, ¶¶ 6-23, 320 Mont. 490, ¶¶ 16-23, 87 P.3d 1017, ¶¶ 16-23. We review de novo whether the court had statutory authority to impose the sentence, whether the sentence falls within the applicable sentencing parameters, and whether the court adhered to the mandates of the applicable sentencing statutes. *State v. Breeding*, 2008 MT 162, ¶ 10, 343 Mont. 323, ¶ 10, 184 P.3d 313, ¶ 10.

¶21 We next review the district court's sentence for an abuse of discretion. *Herd*, ¶ 25. An abuse of discretion exists if the sentencing court acts arbitrarily without employment of conscientious judgment or exceeds the bounds of reason and works a substantial injustice. *Breeding*, ¶ 10. We review findings of fact made by the district court under the clearly erroneous standard. *Breeding*, ¶ 11. Findings of fact are clearly erroneous if they are unsupported by substantial evidence, if the court misapprehended the effect of the evidence, or if a review of the record leaves a definite and firm conviction that the sentencing court made a mistake. *Breeding*, ¶ 11.

8

## DISCUSSION

¶22 *Did the District Court abuse its discretion when it determined McMaster's restitution obligation based in part upon testimony given at the restitution hearing?*

¶23 Our de novo review of McMaster's sentence requires that we first address a potential defect in the sentencing court's restitution determination for McMaster. *Breeding*, ¶ 10. District courts must sentence offenders to make full restitution to victims who have sustained pecuniary losses. Section 46-18-241, MCA; *Breeding*, ¶ 13. Section 46-18-242(1), MCA, provides that "[w]henever the court believes that a victim may have sustained a pecuniary loss . . ." the court shall order the PSI to include a list of the offender's assets and a victim-submitted affidavit describing the victim's pecuniary loss.

¶24 The PSI in this case documented McMaster's assets as a moderate income, a house, two vehicles, and a supplemental income from his wife. The PSI did not include an affidavit submitted by Wright that described Wright's pecuniary loss. Wright did describe his pecuniary losses under oath, however, in his testimony before the district court at the hearing on restitution. McMaster cross-examined Wright at length concerning his alleged losses.

¶25 The record does not reveal whether the District Court ordered the PSI to include a victim's affidavit regarding alleged losses. This Court may disregard any defect in a proceeding that does not affect substantial rights. Section 46-20-701(2), MCA. We conclude that any potential failure on the part of the District Court to order the PSI to include a victim's affidavit did not affect McMaster's substantial rights in light of

9

Wright's extensive and scrutinized testimony at the hearing and our resolution of McMaster's appeal.

¶26 McMaster argues that the District Court could not rely on a cash-flow analysis for determining the victim's losses in this case. McMaster asserts that the State and Wright had to provide documents to support Wright's alleged losses. McMaster argues that due process and the statutory guidelines require documentation to substantiate a court's imposition of restitution. The State responds by noting that McMaster embezzled money through fraudulent accounting practices. The State contends that McMaster's actions rendered the relevant financial documents worthless and necessitated the use of a cash-flow analysis.

¶27 Section 46-18-242(1), MCA, as noted above, requires the PSI in a case involving a pecuniary loss to a victim to include a list of the offender's assets and a victim-submitted affidavit describing the victim's loss. The 2001 version of § 46-18-242(1), MCA, required the PSI to include "documentation" of both the offender's assets and the victim's pecuniary loss. Section 46-18-242(1)(a)-(b), MCA (2001). The legislature eliminated the word "documentation" in 2003. Laws of Montana, 2003, Ch. 272, § 4. The amended statute requires only a "list" of the offender's assets and "an affidavit that specifically describes" the victim's pecuniary loss. Section 46-18-242(1), MCA. The legislature eliminated in 2003 the documentation requirement that McMaster would have this Court impose upon the State.

¶28    We have held that a victim may recover losses "even though the actual losses may be uncertain, if the losses were calculated by use of reasonable methods based on the best evidence available under the circumstances." *State v. Benoit*, 2002 MT 166, ¶ 29, 310 Mont. 449, ¶ 29, 51 P.3d 495, ¶ 29.  We upheld in *Benoit* a district court's reliance on a victim's methodology and underlying assumptions in calculating a restitution amount that stemmed from Benoit's falsifying and voiding sales at a restaurant. *Benoit*, ¶ 30.  We approved of the use of "some guess work" in *Benoit* and concluded that the sentencing court adopted reasonably the restitution calculation method employed by the victim under the circumstances. *Benoit*, ¶ 30.

¶29    The Dissent chides the District Court for crediting the "off-the-cuff surprise, non-expert, undocumented testimony" of Wright and his accountant.  Dissent, ¶ 51.  Nothing in the controlling restitution statutes, however, requires a court or a victim to substantiate a restitution calculation with documentation.  And nothing in the restitution statutes circumscribes a court from relying on victim testimony presented at a sentencing hearing.

¶30    Title 46, Chapter 18, MCA, contains the procedural and substantive guidelines that govern a sentencing court's imposition of restitution.  Section 46-18-242(1), MCA, as noted above, no longer requires the PSI to include "documentation" in support of a calculation of a victim's pecuniary loss.  The statute requires only an affidavit submitted by the victim describing any pecuniary loss.  Section 46-18-242(1)(b), MCA.  In fact, a victim may "decline[] to confer . . ." with the probation officer altogether during the preparation of the PSI regarding the victim's pecuniary loss.  Section 46-18-112(1)(f),

11

MCA.

¶31    District courts must permit victims to present a statement concerning the impact of the crime on the victim and the victim's opinion regarding an appropriate sentence. Section 46-18-115(4)(a), MCA.  The victim may present this statement, "[a]t the victim's option, . . . in writing before the sentencing hearing *or orally under oath at the sentencing hearing, or both*." Section 46-18-115(4)(a), MCA (emphasis added).   Section 46-18-115(4)(b), MCA, requires only that the court provide to the defendant a copy of any written statement submitted by the victim "prior to imposing sentence."

¶32    Section 46-18-115(4)(c), MCA, further provides that a court "shall consider the victim's statement . . ." and authorizes a court to rely on "new material facts . . ." presented by the victim at the sentencing hearing.  A court must provide the defendant with an adequate opportunity to respond if the court intends to rely on new material facts presented by the victim.  Section 46-18-115(4)(c), MCA.  A court also may continue the hearing if it intends to rely upon any new material facts.  Section 46-18-115(4)(c), MCA.

¶33    Wright submitted a written statement regarding the impact of McMaster's embezzlement to the court.  McMaster received this document fifteen minutes before the first day of the hearing on August 24, 2006.  The court continued the hearing at the end of the day on August 24, 2006.  Wright resumed testifying thirteen days later at the second day of the hearing on September 6, 2006.  The court concluded the hearing without imposing sentence.   The court ultimately set McMaster's restitution obligation on September 11, 2006.  McMaster received the written statement submitted by Wright

12

eighteen days "prior to [the court] imposing sentence." Section 46-18-115(4)(b), MCA. Wright chose to present his statement "both" in writing and orally at the sentencing hearing. Section 46-18-115(4)(a), MCA. The District Court, in turn, "consider[ed]" Wright's statement and relied upon "new material facts . . ." contained in the statement. Section 46-18-115(4)(c), MCA.

¶34    The court satisfied § 46-18-115(4)(c), MCA, by providing McMaster with an "adequate opportunity to respond . . ." to Wright's statement. McMaster's expert reviewed Wright's statement between the first day of the hearing on August 24, 2006, and the second day of the hearing on September 6, 2006. McMaster's expert offered a critical analysis of Wright's written statement and the testimony concerning the cash-flow analysis. The court also offered to "continue the sentencing hearing . . ." on at least three separate occasions. McMaster declined each offer. The District Court complied fully with the controlling statutes to the extent that it considered Wright's written statement and credited the "non-expert, undocumented testimony" presented by Wright during the sentencing hearing.

¶35    Section 46-18-243(1)(a), MCA, sets forth the substantive information that a district court may consider when calculating a victim's pecuniary loss. The statute defines pecuniary loss for restitution purposes as "all special damages, but not general damages, substantiated by evidence in the record, that a person could recover against the offender in a civil action . . . ." Section 46-18-243(1)(a), MCA. We have stated that testimony at a sentencing hearing comprises part of the record when considering an

13

appeal in a criminal case. *State v. Korang*, 237 Mont. 390, 396, 773 P.2d 326, 329 (1989); s*ee also State v. Thompson*, 2004 MT 131, ¶¶ 15-17, 321 Mont. 332, ¶¶ 15-17, 91 P.3d 12, ¶¶ 15-17, *overruled in part on other grounds*, *State v. Herman*, 2008 MT 187, 343 Mont. 494, ___ P.3d ___.

¶36 Testimony from McMaster's accountant and the probation officer reveal that both failed to understand the burden of proof for restitution. McMaster's accountant attempted to discredit Wright's restitution analysis. The accountant testified that he would rely only upon "actual records" and would require the records to demonstrate a "direct benefit" to McMaster for any restitution calculation. The probation officer likewise asserted that he would not provide a restitution figure without having "documentable" evidence that demonstrated the victim's losses with "absolute certainty."

¶37 The District Court heard testimony from multiple witnesses who confirmed that McMaster's fraudulent accounting practices prohibited an accurate determination of a restitution amount based upon a review of Crossroads' financial records. McMaster offers no alternative non-documentary method of analysis to determine the restitution amount. Indeed, McMaster's accountant admitted that a cash-flow analysis often could constitute a proper method for determining the restitution amount in an embezzlement case given the inaccuracy of the underlying records. The testimony at the hearing confirmed that the PSI's exclusive reliance on documented transactions did not provide the "best evidence available under the circumstances" in light of McMaster's fraudulent bookkeeping practices and the various embezzlement methods that he had employed.

14

¶38 The District Court heard testimony from numerous witnesses at the sentencing hearing regarding the extent of McMaster's embezzlement. Wright described at length the losses that Crossroads had incurred as a result of McMaster's activities. The District Court provided McMaster with the opportunity to request a continuation of the hearing or a delay of the imposition of McMaster's restitution on several occasions if McMaster felt "disadvantaged" at the lack of timely access to the financial records or if McMaster wanted more time to review the records or to obtain additional records. McMaster declined.

¶39 McMaster admitted to taking money from Wright. The District Court received varying restitution recommendations that ranged from $12,914 to $334,425. The court determined that the pecuniary loss to Wright consisted of at least $102,753. The court reached this amount based upon the calculations made in the PSI, Wright's testimony at the hearing, and the testimony at the hearing concerning the cash-flow analysis. Substantial evidence in the record supports the District Court's findings. *Korang*, 237 Mont. at 396, 773 P.2d at 329.

¶40 The Dissent faults the District Court for discrediting the calculations made by the defense accountant and the probation officer as set forth in the PSI. Dissent, ¶¶ 51-53. The Dissent confuses the duties of the probation officer in creating the PSI with the roles of the court and the victim. The probation officer must make a reasonable effort to ascertain whether a victim has sustained a pecuniary loss. Section 46-18-112(1)(f), MCA. The victim need not provide any information to the probation officer. Section 46-

15

18-112(1)(f), MCA. The victim can wait until the hearing to present testimony or documents in support of the amount of the loss. Section 46-18-115(4)(a), MCA. Moreover, the information included in the PSI does not bind a district court. The court need only "consider" a PSI before imposing a sentence. Section 46-18-111(1), MCA. The Dissent concedes that the court considered the information included in the PSI. Dissent, ¶ 54.

¶41    The Dissent argues that some of Wright's calculations "were demonstrably wrong-- which should have cast suspicion on the rest." Dissent, ¶ 52. The Dissent fails to note that the State established that some of the calculations and assumptions made by Touchette and Johnson also "were demonstrably wrong," which, of course, should have cast suspicion on the rest of their work. For example, Touchette first described McMaster's financial status as a debt of $168,000. Touchette erroneously had failed to account for the value of the assets for which McMaster owed money. Touchette recognized this flaw in his accounting only after extensive questioning from the State, and corrected his assessment of McMaster to a positive financial status of $20,000. Touchette also had accounted zero dollars in restitution for illegitimate trade-outs because he had not "seen any documentation . . . ." Touchette conceded at the same time, however, that the defendant had admitted to illegitimate trade-outs. Similarly, Johnson testified that he would rely only upon "actual records," despite conceding that McMaster had produced no documents for his illegitimate transactions. Nothing prevented the court from deeming the victim's information more accurate than the information presented by

16

the probation officer or by the defendant's expert witness, especially in light of the testimony presented at the hearing.

¶42 The Dissent argues that the proceedings before the District Court constituted a "trial by ambush." Dissent, ¶¶ 47, 60. The record below reveals, however, that the District Court proceeded in compliance with the controlling statutes. In fact, the District Court offered to make accommodations beyond those required by the statute with respect to McMaster's concerns on at least three separate occasions. McMaster declined all three offers.

¶43 McMaster made no requests for additional records in the thirteen days that passed between the first and second day of the hearing. The District Court provided McMaster with multiple opportunities to request a continuance or to delay the imposition of sentence if McMaster felt "disadvantaged" by the lack of financial records or if he wanted more time to obtain additional records. McMaster declined. McMaster's repeated refusal of the court's offers undermines his alleged due process violations and the Dissent's assertion of an "ambush." We will not allow McMaster to decline the District Court's offers for additional time during the hearing and then argue on appeal that he had only "fifteen minutes" to prepare.

¶44 The Dissent claims that the District Court's management of the restitution hearings will discourage defendants from cooperating with the pre-sentence investigation. Dissent, ¶¶ 47, 60. The PSI and testimony from Johnson reveal that McMaster did not cooperate with the pre-sentence investigation that took place before the hearings. We

17

suspect that the disincentive for defendants to cooperate lies not in the sentencing framework set forth in the statutes; rather, the disincentive likely stems from the fact that, for every dollar a defendant admits taking, the court "shall . . . require payment of full restitution to the victim . . . ." Section 46-18-201(5), MCA. As aptly stated in McMaster's PSI: "The defendant minimized the extent of his crime when being investigated and still disputes the amount of restitution owed by him in this case. This is common among people charged with embezzlement."

¶45 The District Court, citing *State v. Pritchett*, 2000 MT 261, 302 Mont. 1, 11 P.3d 539, limited the restitution amount to $30,000 based on the court's assessment of McMaster's ability to pay the restitution. The legislature amended the restitution statute in 2003 and eliminated the need to include in the PSI the offender's "future ability to pay restitution . . . ." Laws of Montana, 2003, Ch. 272, § 4. An offender's future ability to pay restitution no longer remains a consideration under § 46-18-242, MCA. *State v. Workman*, 2005 MT 22, ¶ 15, 326 Mont. 1, ¶ 15, 107 P.3d 462, ¶ 15. The State correctly points out that the court's consideration of this factor simply worked in McMaster's favor. We conclude, therefore, that the District Court did not abuse its discretion when it ordered McMaster to pay restitution in the amount of $30,000.

¶46 Affirmed.

/S/ BRIAN MORRIS

18

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice James C. Nelson dissents.

¶47    I dissent from the Court's Opinion.  What took place at the restitution hearing violates fundamental fairness.  The Court's decision sets a precedent that will encourage "trial by ambush" tactics and will serve as a disincentive for defendants to cooperate in any presentence investigation (PSI) ordered by the trial court.

¶48    The procedural background of this case deserves to be recounted.  To begin with, probation officer Michael Touchette (Touchette) and forensic accountant David Johnson (Johnson), who was qualified as an expert by the trial court, carefully reviewed all available information provided to them by the prosecution and in possession of law enforcement, including the investigating officer's report.  Touchette and Johnson interviewed the parties, including the Crossroads Fitness Center's owner, Dr. Dennis Wright (Wright), and made a restitution recommendation in the PSI of $12,914.46.  Both Touchette and Johnson believed that this was the amount that was provable as criminal conduct by McMaster and his accomplice.  They believed that other claims, ranging from $66,000 by the investigating officer to some $300,000 by Wright, were the result of bad

19

business judgment and mismanagement—largely because McMaster was not a businessman—rather than the result of embezzlement or other criminal conduct.

¶49 No additional information was made available to the defense or to the probation officer until fifteen minutes before the restitution hearing was scheduled to commence. At this time, the prosecution faxed to defense counsel a document prepared by Wright with the demand for $334,425 in restitution calculated by "project[ing] . . . back" the money Crossroads Fitness Center (Crossroads) should have made during 2003, 2004, and 2005. Using a different method—one deemed "less accurate" by Wright—he calculated that the funds stolen from Crossroads, in addition to an accounting fee, totaled $251,118. No supporting documentation was produced then, nor has it been produced since, to substantiate Wright's claims. Wright's bare, undocumented demand for $334,425 in restitution was provided to and considered by the court at the restitution hearing.

¶50 At the hearing, Wright offered all sorts of testimony about his claimed losses and how they were calculated. Wright conceded that he was not an accountant, that he had no formal business training, and that he had never conducted a forensic audit. Wright never produced any documentation substantiating his claims, and his figures and recollections were, at best, equivocal in a number of particulars. Indeed, some of his contentions were proven to be flat wrong by Touchette and Johnson.[1] Another prosecution witness, Leigh

---

[1] Indeed, compare our decision in a recent civil case involving an inverse condemnation issue, *K & R Partnership v. City of Whitefish*, 2008 MT 228, ___ Mont. ___, ___ P.3d ___. There we observed that, to comply with the second prong of the "landowner-witness" rule, where a property owner (there a landowner) testifies as to the value of his own property beyond its current use, he must have some peculiar knowledge not

20

Ann West Simendinger (Simendinger) likewise testified completely out of the blue. Simendinger apparently had an accounting degree and had passed the CPA exam, but had not activated her license in Montana. She was not qualified as an expert. She produced no written report; testified without producing any records; and admitted that she had not audited Crossroads' books. She admitted that she was not qualified to give an audit opinion. Indeed, Johnson—who was a forensic accountant and who was qualified as an expert—found her calculations to be "totally irresponsible" without having produced any evidence to support her conclusions. Wright's and Simendinger's testimony was admitted over McMaster's objections.

¶51 As noted in ¶ 19 of the Court's Opinion, the trial judge settled on a restitution figure of $30,000—not as the amount which McMaster was criminally responsible for, but as the amount he could likely pay. Clearly, the trial court discredited the careful analysis of the defense witness—expert forensic accountant Johnson—and probation officer Touchette, and, instead, credited the off-the-cuff surprise, non-expert, undocumented testimony of Wright and Simendinger.

¶52 Here, Johnson and Touchette, working diligently together from all of the documentary evidence provided to them by the prosecution and from their interviews of

possessed by the average layman and must indicate some basis or foundation for his claimed expertise. *See K & R Partnership*, ¶¶ 43, 45. Quite to the contrary, here, Wright admitted no business or accounting experience at all, much less any expertise in computing the forensic loss from a claimed business embezzlement. In the restitution hearing, however, he was allowed to pull figures out of the air without documentation or foundation using questionable methodologies and procedures—some of which were demonstrably wrong.

21

witnesses, including Wright, came up with a figure of $12,914.46. Minutes before the restitution hearing was to begin, the prosecution came up with all new numbers and claims by witnesses which had not been disclosed previously by the State. No documentation was ever produced to support the new numbers or the methodology by which these numbers were produced. Some of Wright's self-serving claims and calculations were demonstrably wrong—which should have cast suspicion on the rest.

¶53 We have previously stated that methods used to calculate restitution—including " 'some guess work' " on the part of a victim—may be acceptable if the methods utilized were "reasonable based on the *best evidence* available under the circumstances presented" in the case. *State v. Benoit*, 2002 MT 166, ¶ 30, 310 Mont. 449, ¶ 30, 51 P.3d 495, ¶ 30 (emphasis added). Here, the methods utilized by Johnson and Touchette were based on the "best evidence available under the circumstances." Indeed, the $12,914.46 restitution figure they compiled was the *only* figure supported by documentation. Wright never produced *any* documentation in support of his self-serving claims for $334,425 or $251,118. Simendinger's unsupported calculations and methodologies were labeled as "irresponsible" by the forensic accountant. And, many of Wright's claims were shown to be flat wrong. Accordingly, the trial court's decision based on the surprise evidence at the restitution hearing was clearly *not* the best evidence available under the circumstances.

¶54 Moreover, the District Court noted that "Wright's estimate of the total stolen is probably somewhat overstated." Despite this concession, the court apparently decided

22

that Wright's estimate of the total amount stolen was "closer to the mark than is the amount of restitution" suggested in the PSI, in large part because the PSI failed to account for "trade outs"—whereby McMaster traded club memberships for goods and services from area businesses. Yet the PSI noted that the problem with calculating the value of trade-outs was that the "club would not have received full membership dues for every individual who was given a trade-out." The court made no attempt to resolve this issue and instead concluded that McMaster took at least $21,000 from Crossroads in unauthorized trade-outs.

¶55   While this Court takes great pains to note that § 46-18-242(1), MCA, no longer requires documentation in support of a calculation of a victim's pecuniary loss, the Court conflates consideration of the impact of the crime on a victim with a determination of a victim's pecuniary loss or restitution amount.

¶56   A PSI shall contain information on a victim's pecuniary loss. *See* § 46-18-112(1)(f), MCA (when a PSI is required, the probation officer shall inquire into and report upon "the victim's pecuniary loss, if any"); § 46-18-242, MCA ("Whenever the court believes that a victim may have sustained a pecuniary loss," the PSI shall include a list of the offender's assets and an affidavit that specifically describes the victim's pecuniary loss.). If a PSI is not authorized or requested, "the court shall accept evidence of the victim's loss at the time of sentencing." Section 46-18-242(2), MCA. Here, there was a PSI. Wright had been interviewed by the probation officer in accordance with § 46-18-112(1)(f), MCA. There were no challenges to the accuracy of

23

the information in the PSI. And, the court was under no obligation to allow, much less credit, Wright's wild, undocumented, and self-serving claims of pecuniary loss.

¶57 The law also provides that the court "shall permit the victim to present a statement concerning the effects of the crime on the victim, the circumstances surrounding the crime, the manner in which the crime was perpetrated, and the victim's opinion regarding appropriate sentence." Section 46-18-115(4)(a), MCA. The substance of a victim's statement concerning the effects of the crime on the victim—which presumably may include a description of how the crime made the victim feel, the loss of sleep suffered by the victim as a result of the crime, the effect on family relationships, etc.—is entirely separate and apart from the calculation of pecuniary loss, which must be "substantiated by evidence in the record." Section 46-18-243(1)(a), MCA. This calculation must be based on "the *best evidence* available under the circumstances presented" in the case. *Benoit*, ¶ 30 (emphasis added).

¶58 Furthermore, § 46-18-243(1)(a), MCA, defines the victim's pecuniary loss in terms of what could be proven in a civil action under the applicable standard of proof. I am unaware of any civil case that we have ever decided in which this Court affirmed a trial court's decision that resulted from a situation like the one at issue here—i.e., a party prepares to come to court with his witnesses for a damages hearing; he's ready to present evidence based on his and his expert's own investigations, interviews of opposing witnesses, audits of information, and documents and discovery provided by the adverse party; but fifteen minutes before the hearing, the adverse party comes up with entirely

24

new numbers, undisclosed witnesses, no experts, questionable methodologies, and no documents to back any of it up. To make matters worse, the court allows this undisclosed and untested evidence to be admitted over the adverse party's objection, and then rules on the basis of this information. We would never allow this scenario in a civil context. Wright could not, under any standard of proof that I am aware of, prove his wild, self-serving claims of loss in a civil case in the manner that the trial court allowed here.

¶59 Unfortunately, this Court, today, says that this sort of practice and procedure is perfectly acceptable in a criminal case. Our decision now serves as precedent for prosecutors and trial judges across the State to do exactly the same thing—sandbag[2] the defense on the morning of the hearing. And, presumably, the State will not be heard to complain when the defendant refuses to cooperate in the presentence investigation, and,

---

[2] Ironically, we recently condemned this sort of conduct in another civil case, *Nikolaisen v. Advance Transformer Co.*, 2007 MT 352, 340 Mont. 332, 174 P.3d 940, wherein we stated:

> The term "**sandbagged**," in the present context derives from the tactic of a poker player to trap another player by checking a strong hand to induce a bet, and then raising once that bet is made. *Webster's Third New International Dictionary, Unabridged* 2009 (Philip Babcock Gove, ed., Merriam-Webster, Inc. 2002). In law it has come to mean, inter alia, the practice of unfairly remaining silent concerning an important point in order to lull another party to inaction. *See U.S. v. Pielago*, 135 F.3d 703, 709 (11th Cir. 1998); *State v. Mendoza-Solario*, 33 P.3d 411, 416 (Wash. App. Div. 3 2001); *DeShields v. State*, 534 A.2d 630, 645 (Del. 1987); *Gilbert v. K.T.I., Inc.*, 765 S.W.2d 289, 295 (Mo. App. W. Dist. 1988); *Wiard v. Liberty Northwest Ins. Corp.*, 2003 MT 295, ¶ 50, 318 Mont. 132, ¶ 50, 79 P.3d 281, ¶ 50 (Nelson, J., concurring).

*Nikolaisen*, ¶ 27 n. 1 (Warner, J., specially concurring) (emphasis added).

instead, shows up at the restitution hearing with a whole plethora of undisclosed witnesses, experts, and expert-wannabes who offer speculative and undocumented, self-serving testimony and hearsay.

¶60 I cannot condone this "trial by ambush" approach. It is unfair; it is antithetical to the search for truth; it discourages cooperation between the parties and the investigating probation officer; it obviates trust and reliance on mutual discovery; it rewards the party who waits until the last minute to prepare his or her case; it encourages sharp practice; it demeans the careful work of the investigating probation officer; it destroys the orderly administration of justice; and, ultimately, it produces an inaccurate and unjust result which is not based on the best evidence available.

¶61 McMaster is entitled to have his restitution obligation reduced to $12,914.46. I dissent.

/S/ JAMES C. NELSON