

**FILED**

12/19/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0476

DA 15-0476

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 314

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

STEPHEN EDWARD SANTILLAN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 14-149
Honorable Mary Jane Knisely, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Chief Appellate Defender, Haley Connell Jackson, Assistant Appellate Defender, Helena, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Michael S. Wellenstein, Assistant Attorney General, Helena, Montana

        Scott Twito, Yellowstone County Attorney, Brent Linneweber, Deputy County Attorney, Billings, Montana

        Submitted on Briefs:  October 18, 2017

               Decided:  December 19, 2017

Filed:

                                                            Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Defendant Stephen Santillan (Santillan) appeals from a judgment of the Thirteenth Judicial District Court, Yellowstone County, sentencing him to 40 years incarceration, with 10 years suspended, and requiring him to pay $3,568,861.69 in restitution.

¶2 We affirm and address the following issues:

1. *Did the District Court err in admitting testimony that Child Protective Services removed children from Santillan's care?*

2. *Did the District Court err by ordering Santillan pay restitution for the victim's future psychiatric treatment, counseling, family and marriage counseling, group home care, and case management expenses?*

**FACTUAL AND PROCEDURAL BACKGROUND**

¶3 A.C. was tragically injured in July 2013 while in Santillan's care. She is the daughter of Danielle, Santillan's girlfriend, and Mitch and was born in August 2010. Danielle and Mitch shared parenting time pursuant to an informal agreement; Danielle parented A.C. from Sunday evening until Thursday evening, while Mitch parented A.C. from Thursday evening until Sunday evening. Before July 2013, A.C. exhibited some communication and language delays—she could not carry on a conversation and knew about five words. She was involved in a program called Early Childhood Intervention to help her communicate and learn language.

¶4 Danielle and Santillan had a son, J.S., in August 2011. On June 13, 2013, Santillan moved into Danielle's apartment, where Danielle, A.C., and J.S. lived. At that time, A.C. was almost three years old and J.S. was almost two years old. Danielle worked varying hours during the day. Santillan worked the night shift from approximately 10:30 p.m. until

2

3:00 a.m. Before Santillan moved in, A.C. and J.S. went to daycare while Danielle worked. The children stopped going to daycare in June 2013 due to the expense and because Santillan and Danielle's work schedules allowed one of them to care for the children while the other worked. Thus, Santillan cared for A.C. and J.S. while Danielle worked during the day.

¶5     On Sunday, July 7, 2013, Mitch dropped A.C. off at Danielle's apartment pursuant to their informal parenting arrangement. A.C. was healthy at that time. Danielle did not work on Wednesday, July 10, 2013, so she watched A.C. and J.S. while Santillan slept most of the day. A.C. acted normal that day and there were no indications that she was hurt. Santillan woke up in time to eat dinner with Danielle and the children, then he got ready for and went to work. Santillan got off work at 2:52 a.m. on Thursday, July 11, 2013. Danielle, A.C., and J.S. were sleeping when he got home. Santillan took a shower, got ready for bed, and fell asleep.

¶6     Danielle had an appointment at 8:30 a.m. on July 11, 2013, so she and A.C. woke up around 7:30 a.m. that morning. Danielle got ready for her appointment and A.C. woke Santillan up before Danielle left. Danielle was gone for about an hour, and A.C. was acting normal before Danielle left and when she returned home. Danielle watched cartoons with A.C. when she got home and then left for work around 10:30 a.m. Santillan was the only person with A.C. and J.S. after Danielle left for work.

¶7     About three hours later, at 1:19 p.m., Santillan called Danielle at work. He told her that A.C. was shaking and cold and that she should probably come home. Danielle asked Santillan what happened, and Santillan said J.S. threw a plastic toy car at the back of A.C.'s

3

head, after which she started acting strangely. Danielle left work and went home. A.C. was laying down, not moving, had vomited, and looked lethargic and pale—Danielle had never seen A.C. look that way before. Danielle called a nursing hotline and was told to call 9-1-1 for an ambulance, but Danielle decided it was faster to take A.C. to the hospital herself. Santillan suggested that A.C. looked tired and needed a nap, but Danielle disagreed and prepared A.C. for the trip to the hospital. Danielle drove A.C., along with Santillan and J.S., to the emergency room.

¶8 At the hospital, an emergency room nurse performed A.C.'s initial assessment. When the nurse walked into the exam room she observed A.C. laying on a gurney, cradling the side rail, facing away from her family, and not interacting with anyone. That behavior struck the nurse as unusual because children are usually afraid at the hospital and cling to their parents. A.C.'s eyes were closed—she was drowsy, subdued, limp, and would cry or whimper when touched or moved. The nurse observed that A.C. had a bump on the back of her head and some other bruises. The nurse was told that A.C.'s younger brother hit her in the back of the head with a toy car, and after that happened her extremities felt cool, she began acting strangely, and she vomited.

¶9 After performing the initial assessment, the nurse left the exam room and told Dr. John Kominsky (Dr. Kominsky) about A.C.'s injuries and behavior. Dr. Kominsky immediately assessed A.C., noted her altered level of consciousness, and ordered a CAT scan and a full-body skeletal x-ray. The CAT scan revealed a linear occipital skull fracture on the back of A.C.'s head and a contrecoup injury in the front left portion of her brain. A contrecoup injury is an injury that occurs on the opposite side of the brain from where an

4

impact occurred. An impact to one side of the head causes the brain to move inside the skull, and when the head stops moving the brain hits the opposite side of the skull from the impact area, resulting in injury and bleeding. Dr. Kominsky activated trauma protocol; consulted with a pediatric intensivist; and ordered an IV, fluids, labs, and medication. The doctor then arranged to transport A.C. to a children's hospital in Denver where a pediatric neurosurgeon could treat her. While she waited for transport, A.C. remained lethargic and sleepy—hospital staff monitored her and gave her medication to control her vomiting.

¶10 Dr. Kominsky diagnosed A.C. with a skull fracture, brain hemorrhage, and child abuse. The child abuse diagnosis was due, in part, to Dr. Kominsky's concern that A.C.'s serious head injury was not consistent with the provided explanation of her younger brother throwing a toy car at the back of her head. The hospital contacted the police and Child Protective Services (CPS) based on the diagnoses and the staff's observations. Police arrived at the hospital, assessed A.C., and spoke with Danielle and Santillan. A CPS worker, Kathy Rogers (Rogers), also arrived at the hospital in response to the hospital's alert. Rogers observed A.C. and spoke with hospital staff, the responding police officers, Mitch, Danielle, and Santillan. Santillan told Rogers that A.C. was injured after J.S. threw a toy car at her head. Santillan returned to the apartment with two police officers who videotaped Santillan's explanation and reenactment of J.S. throwing the toy car at A.C.

¶11 Meanwhile, Mitch accompanied A.C. on the flight to the children's hospital in Denver. When A.C. arrived in Denver, Dr. Brent O'Neill (Dr. O'Neill), a pediatric neurosurgeon, was among her treating physicians. Dr. O'Neill reviewed A.C.'s CAT scan and ordered an MRI. The MRI provided more detail of the injury—the results showed a

5

contusion, subarachnoid hemorrhage, and bleeding into the subdural space around A.C.'s left frontal lobe. An ophthalmologist examined A.C. and found two small retinal hemorrhages in her left eye. Dr. O'Neill determined he did not need to operate on A.C. but she remained in the hospital for monitoring. A.C.'s condition improved while she was in the hospital; her vomiting subsided and she became less irritable and more comfortable. A.C. was discharged on July 16, 2013, but her injuries necessitate extensive follow-up care. She returns to the Denver hospital periodically for check-ups and continuing care. Post-brain injury she was diagnosed with multiple delays—at four and one-half years old she was assessed as functioning as a child aged between 16 and 26 months. Following the incident, A.C. attended a special education preschool three days a week, speech therapy three days a week, occupational therapy one day a week, and counseling and play therapy one day a week, among other services and treatments.

¶12 An investigation into the circumstances surrounding A.C.'s injury ensued. Because of her communication delays at the time of the incident, A.C. was never able to tell anyone how she was injured. In February 2014, the State charged Santillan with aggravated assault and the case proceeded to a four-day trial in August 2014. The State called many witnesses during its case-in-chief, including Mitch, Danielle, A.C.'s past daycare provider, the nurse who performed A.C.'s initial assessment, and police officers who initially responded to and subsequently investigated the case.

¶13 Social worker Rogers, the CPS worker who interviewed Santillan at the hospital, also testified for the State. In his trial brief and again during pre-trial in-chamber conversations, Santillan objected to any testimony from Rogers regarding her removal of

the children from Santillan's care after her investigation. Santillan objected on the grounds that the information was irrelevant to the aggravated assault charge and, even if relevant, highly prejudicial, confusing, and misleading. The State argued that the information was relevant to Rogers's "decision about the safety of the children" and that the information "coincide[d] and correspond[ed] with the investigation of law enforcement." The State claimed it would be misleading to not allow the jury to hear the results of Rogers's investigation, because the jury would subsequently think Rogers "had a different interpretation than law enforcement and medical personnel." The District Court overruled Santillan's objection. Thus, Rogers testified that, after her initial investigation at the hospital on July 11, 2013, she decided to remove J.S. and A.C. from Santillan's care, placing J.S. in foster care and placing A.C. with Mitch.

¶14 The State also called three doctors as witnesses. Dr. Kominsky, the physician who treated A.C. in the emergency room on July 11, 2013, testified about the events of that day. He also testified that A.C. suffered an acute injury, meaning that A.C.'s clinical symptoms such as sleepiness and vomiting would have appeared immediately or within hours of the injury occurring. Dr. Kominsky testified that he was "very certain" about his child abuse diagnosis and that, based on his training, experience, and research, he did not believe that a 22-month-old throwing a toy car could have generated enough force to cause A.C.'s injuries.

¶15 Dr. O'Neill, the pediatric neurosurgeon who treated A.C. in Denver, testified extensively about the timing of A.C.'s head injuries and the ways they could have occurred. As to the timing of the injuries, Dr. O'Neill testified that, based on the CAT and MRI

results, A.C.'s brain injury could have occurred immediately before she arrived at the emergency room up to a few days before, but that the injury most likely occurred within a few hours of her getting to the hospital. Further, Dr. O'Neill linked A.C.'s clinical symptoms to her brain injuries, and explained to the jury that A.C. would have been immediately symptomatic after her skull was fractured. He testified that the onset of A.C.'s clinical symptoms—vomiting and lethargy—narrowed the time frame of when the brain injury occurred. As to the cause of A.C.'s injury, Dr. O'Neill testified that A.C.'s skull fracture was the result of a forceful impact with a hard object. He determined it was not plausible for A.C.'s injuries to result from a small child throwing a plastic toy car at the back of A.C.'s head. Dr. O'Neill noted that he had never seen and was not aware of any other situation where retinal hemorrhages—A.C. had two—occurred outside of an abusive head injury. Dr. O'Neill testified that, taking all of A.C.'s injuries and the timing of her symptoms into account, the injuries were "most consistent with abuse."

¶16 Dr. Wilbur Smith (Dr. Smith), a medical school professor and board-certified physician in pediatrics, radiology, and pediatric radiology, also testified for the State. Dr. Smith did not personally treat A.C., but reviewed A.C.'s medical records, including her CAT and MRI images and her follow-up psychological evaluations. He also reviewed Santillan's police statement. Upon his review of the CAT and MRI results, Dr. Smith diagnosed A.C. with an occipital bone skull fracture and a contrecoup injury to the front of her brain. Dr. Smith described that, due to the injury, parts of A.C.'s frontal lobe will die and that she will likely have scarring in the portion of her brain controlling inhibition and behavior. Dr. Smith explained that such injuries will affect A.C.'s life later. As to the

8

cause of A.C.'s injuries, Dr. Smith explained that her injuries had to have been the result of some sort of propulsion, such as being hit with a hard object or falling from a second story window, and rejected the proposition that J.S. could have caused the injury with a toy car. He explained to the jury what a contrecoup injury is—how an impact to one side of the head results in bruising and bleeding on the opposite side of the brain. He also educated the jury on the dangers of brain bleeds and testified that A.C. suffered a serious brain injury. Dr. Smith echoed Dr. Kominsky and Dr. O'Neill's testimony regarding the timing of A.C.'s brain injury, explaining that symptoms such as vomiting, irritability, altered mental status, and unconsciousness would have occurred immediately following the injury.

¶17 After the State presented its case-in-chief, the defense called two witnesses: Dr. George Nichols (Dr. Nichols) and Santillan. Dr. Nichols, a forensic pathologist, did not treat A.C. personally but reviewed Dr. Smith's report, A.C.'s medical records and imaging studies, as well as police reports and other documents related to A.C.'s injury. Dr. Nichols testified that, as a pathologist, he does not assess CAT or MRI images himself, but instead relies on radiology reports in his analyses. Dr. Nichols noted the same injuries to A.C. as the other doctors—an occipital skull fracture and bruising and bleeding in the frontal lobe. As to the cause of the injury, Dr. Nichols also stated there was no way a small child could have caused the injury by throwing a toy car. He testified that the injury may have been the result of a fall or child abuse. Dr. Nichols disagreed with the other doctors regarding the timing of the incident based on the scans. He stated that A.C.'s head injuries could have occurred within 24 hours or as long as four weeks prior to the hospital visit on July

11, 2013. Dr. Nichols did state, however, that A.C.'s symptoms would have occurred within hours, but not necessarily immediately, after her injury occurred.

¶18 During his testimony, Santillan recounted the events of the day. He acknowledged there was no way J.S. could have caused A.C.'s injury by throwing a toy car at the back of her head, but testified that was the only thing he saw happen to A.C. He maintained his innocence, stating that he did not hurt A.C. and that he did not know how she sustained such serious injuries. Santillan recognized that he was the only adult with A.C. on the morning of July 11, 2013, and testified that neither Danielle nor J.S. injured A.C.

¶19 The jury found Santillan guilty of aggravated assault. The District Court sentenced Santillan in June 2015. The State called three witnesses at the sentencing hearing: Danielle, A.C.'s mother; Jordan, A.C.'s stepmother who cares for A.C. on a daily basis; and Kathleen Rau (Rau), a registered nurse. Danielle explained that A.C.'s life was forever changed by the head injury and that A.C. must now go to daily appointments to aid her recovery. Jordan testified about A.C.'s developmental delays and the difficulties in caring for A.C. on a daily basis post-head-injury. Jordan also told the court about A.C.'s frequent check-ups at the Non-Accidental Brain Injury Clinic at the children's hospital in Denver and recent complications with those appointments.

¶20 Rau testified about A.C.'s life treatment plan (Plan) that she prepared with the help of A.C.'s speech and occupational therapists and Dr. Mike Dichiaro (Dr. Dichiaro), a rehabilitation specialist at the clinic in Denver, who provides ongoing treatment for A.C. The Plan outlined the costs of the care, services, and treatment A.C. will need throughout her life due to her brain injury. Rau prepared the Plan after reviewing A.C.'s medical

10

records and medications, police reports, and the prosecutor's file; speaking with A.C.'s caregivers, Dr. Dichiaro, A.C.'s speech therapist, A.C.'s occupational therapist, and A.C.'s preschool teacher; and meeting A.C. and observing her in various settings. Rau researched the life expectancy of children who suffer traumatic brain injuries and determined that A.C.'s life expectancy is approximately 60 years.

¶21 The Plan recommended various services for A.C. and approximated the cost of each service. It recommended, among other services not at issue on appeal, that A.C. receive psychiatric treatment once a month beginning at age 8 until age 60 at a total cost of $66,000; counseling once a week until age 60 at a total cost of $182,000; and family and marriage counseling for Mitch's family once a week until age 18 at a total cost of $46,200. Dr. Dichiaro and Rau also determined that, more likely than not, A.C. will be unable to live independently as an adult; thus, the Plan included the cost of A.C. living at a group home with case management services from age 18 until age 60 at a total cost of $3,150,000. Rau and Dr. Dichiaro formulated the Plan based on their training and experience, research, and review of A.C.'s specific circumstances. The Plan explained why A.C. required each service and Rau's testimony at the sentencing hearing further detailed each service and why it was necessary based on A.C.'s head injury. Rau acknowledged that the Plan's recommendations and costs are fluid because there is no way to know if A.C.'s current state will improve as she ages, and if it does improve, to what extent. Defense counsel asked Rau if she was speculating as to the services and costs, and she replied, "Absolutely. But we're speculating with research and evidence based on the type of injury that [A.C.] suffered, and her behaviors up to this point."

11

¶22 The defense did not call any witnesses at the sentencing hearing. Santillan gave a statement to the court, maintaining his innocence while apologizing that he did not have an explanation for what happened to A.C. The District Court sentenced Santillan to a period of incarceration and also ordered he pay all of the restitution requested by the State, including the costs of psychiatric treatment, counseling, family and marriage counseling, and A.C. living at a group home from age 18 to age 60. The District Court specifically found all of those services were "more likely than not necessary services to restore [A.C.] and her family."

¶23 Santillan now appeals the District Court's judgment for two reasons. First, he alleges the court improperly allowed Rogers to testify about the Department's decision to remove Santillan's children from his care following the incident. The State responds, arguing the testimony was not improper, but that even if it was, the court's error was harmless. Second, Santillan maintains that the District Court's imposition of restitution for the costs of psychiatric treatment, counseling, family and marriage counseling, and A.C. living at a group home was speculative and therefore improper. The State contends that the costs were not speculative and are proper under the circumstances of the case.

## STANDARDS OF REVIEW

¶24 A trial court has broad discretion in determining the relevance and admissibility of evidence. *State v. Passmore*, 2010 MT 34, ¶ 51, 355 Mont. 187, 225 P.3d 1229. Accordingly, this Court generally reviews a trial court's evidentiary rulings for an abuse of discretion. *State v. Derbyshire*, 2009 MT 27, ¶ 19, 349 Mont. 114, 201 P.3d 811. However, a trial court must exercise its discretion within the bounds of evidentiary rules and statutes.

12

*Derbyshire*, ¶ 19.  Thus, we review a trial court's ruling based on the interpretation of an evidentiary rule or statute de novo.  *State v. Henson*, 2010 MT 136, ¶ 19, 356 Mont. 458, 235 P.3d 1274; *Derbyshire*, ¶ 19.

¶25    The appropriate measure of restitution is a question of law that this Court reviews for correctness.  *State v. Passwater*, 2015 MT 159, ¶ 9, 379 Mont. 372, 350 P.3d 382 (citing *State v. Aragon*, 2014 MT 89, ¶ 9, 374 Mont. 391, 321 P.3d 841).  We review a district court's findings of fact as to the amount of restitution for clear error.  *Passwater*, ¶ 9; *State v. Johnson*, 2011 MT 116, ¶ 13, 360 Mont. 443, 254 P.3d 578.  A finding of fact is "clearly erroneous if it is not supported by substantial evidence, the court has misapprehended the effect of the evidence, or our review of the record convinces us that a mistake has been committed."  *Aragon*, ¶ 9 (internal quotations and citations omitted).  Substantial evidence "is evidence that a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance."  *Aragon*, ¶ 9 (quoting *State v. Jent*, 2013 MT 93, ¶ 10, 369 Mont. 468, 299 P.3d 332).

**DISCUSSION**

¶26    *1.  Did the District Court err in admitting testimony that Child Protective Services removed children from Santillan's care?*

¶27    Santillan contends Rogers's testimony that she removed J.S. and A.C. from Santillan's care following the July 11, 2013 incident was improper.  He argues the evidence was irrelevant, and that even if relevant it should be excluded under M. R. Evid. 403 because its probative value is substantially outweighed by the danger of unfair prejudice,

confusion of the issues, or misleading the jury. The State responds, arguing that the information was relevant and not excludable under M. R. Evid. 403. The State further reasons that, even if the testimony was erroneously admitted, any error was harmless. Santillan responds that the error was not harmless.

¶28 We begin by observing general rules of evidence regarding the competency of a witness to testify as to a particular matter. "Every person is competent to be a witness except as otherwise provided in [the Rules of Evidence]." M. R. Evid. 601. M. R. Evid. 602 provides, "A witness may not testify as to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." An exception to M. R. Evid. 602 is testimony from expert witnesses, who may testify absent personal knowledge if certain criteria are met. Pursuant to M. R. Evid. 701, "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the *perception* of the witness *and* (b) helpful to a clear understanding of the witness' testimony or the determination of a *fact in issue*." (Emphasis added.)

¶29 Children may be removed from a parent's care on an emergency basis if there is reason to believe the child is in immediate or apparent danger of harm. Section 41-3-301(1), MCA. Although related in many respects, an investigation conducted by a CPS worker pursuant to Title 41 is different from an investigation conducted by law enforcement for criminal offenses. Indeed, absent a disclosure exception, Rogers's investigation, records, and any decisions she made were confidential pursuant to § 41-3-205, MCA. While a CPS worker may, in the course of carrying out her job

14

responsibilities, acquire personal knowledge of certain facts relevant to a criminal prosecution that a court may allow her to disclose pursuant to § 41-3-205(2), MCA,[1] that is not always the case. For example, testimony of a CPS worker not based on personal knowledge of the facts giving rise to a charged offense that is not otherwise an expert opinion is confidential and irrelevant in a criminal prosecution.

¶30     Rogers's decision to remove the children from Santillan's care was the result of her independent investigation and subsequent opinion that the children were in immediate or apparent danger of harm.  Rogers was neither an expert nor a fact witness; she did not have personal knowledge of the assault or any circumstance making an element of the offense more or less probable.  Rogers was not competent as a lay opinion witness because her testimony was not based upon her personal observations.  Rogers had no personal knowledge of whether Santillan caused serious bodily injury to A.C. and the results of Rogers's investigation were not a "fact in issue."  The State's express purpose for introducing Rogers's testimony was to allow the jury to know the results of her investigation so that the jury would not think Rogers "had a different interpretation than law enforcement and medical personnel."  Rogers's testimony was simply her conclusion, based upon information gathered from others, that A.C. and J.S. should be removed because the children were in immediate or apparent danger.  Her decision, moreover, appeared obvious given the severity of A.C.'s injuries, that the injuries were inconsistent with the explanation of J.S. throwing a toy car at A.C., and that the injury occurred in the

---

[1]  Section 41-3-205(2), MCA, provides, "The court may permit public disclosure if it finds disclosure to be necessary for the fair resolution of an issue before it."

children's home. Accordingly, Rogers, who was not an expert witness, had no personal knowledge of the matter upon which she testified.

¶31 We also conclude that Rogers's testimony was not relevant to any fact which was of consequence in determining Santillan's guilt. Only relevant evidence is admissible at trial. M. R. Evid. 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M. R. Evid. 401. The State charged Santillan with aggravated assault. Section 45-5-202(1), MCA, provides, "A person commits the offense of aggravated assault if the person purposely or knowingly causes serious bodily injury to another . . . ." Accordingly, in order to prove Santillan guilty of aggravated assault, the State needed to prove beyond a reasonable doubt that Santillan purposely or knowingly caused serious bodily injury to A.C. on July 11, 2013. *See* § 46-16-204, MCA (requiring a criminal defendant be proven guilty beyond a reasonable doubt). Evidence relevant to whether Santillan committed aggravated assault is evidence having any tendency to show it is more or less probable that Santillan caused serious bodily injury to A.C. on July 11, 2013.

¶32 Rogers's investigation and her decision to remove the children was not relevant to whether Santillan was guilty of aggravated assault and her testimony did nothing to make an element of the offense more probable. Significantly, Rogers's decision to remove the children pertained to Danielle and Mitch, as well as Santillan. Rogers initially removed the children from Danielle, Santillan, and Mitch's care. The case against Mitch was dismissed almost immediately, but the case against Danielle remained. Rogers's decision

16

to place J.S. in foster care and A.C. in the care of Mitch following discharge from the hospital only reflects upon Rogers's perceived safety of the children while they were in Danielle and Santillan's care, not whether Santillan caused A.C. serious bodily injury on July 11, 2013.

¶33 Moreover, the State had to prove Santillan guilty of aggravated assault beyond a reasonable doubt, a different standard of proof and inquiry than Rogers's "reason to believe" that A.C. was in apparent danger. In *Smith v. Rorvik*, we examined whether, in a civil action, issuance or nonissuance of a criminal citation regarding the same traffic incident was relevant. 231 Mont. 85, 90, 751 P.2d 1053, 1056 (1988). We held evidence regarding a criminal citation was not relevant to the civil case, explaining that "[t]he elements of proof in civil and criminal trials are decidedly different. Evidence that the officer did not issue a criminal citation to the appellant is generally irrelevant to the question of negligence in a civil trial." *Smith*, 231 Mont. at 90, 751 P.2d at 1056 (quoting *Underwood v. Butler*, 304 S.E.2d 729, 731 (Ga. Ct. App. 1983)). When different burdens of proof apply, there exists a danger that a jury may conflate the varying standards, potentially leading to confusion and improper conclusions. *Peterson v. St. Paul Fire and Marine Ins. Co.*, 2010 MT 187, ¶ 82, 357 Mont. 293, 239 P.3d 904 (Nelson, J., specially concurring) ("[L]ay persons conflate criminal liability . . . with civil liability or 'fault.'"). Rogers's decision to remove the children from Santillan's care required a different standard of proof than the jury's determination that Santillan committed aggravated assault beyond a reasonable doubt. Therefore, the District Court erred when it allowed Rogers's testimony as to that fact, as the evidence was irrelevant.

¶34 Even though the District Court erred in admitting evidence that children were removed from Santillan's care, we will not reverse the judgment if the error was harmless. This Court conducts a two-step harmless error analysis "to determine whether the alleged error prejudiced the criminal defendant's right to a fair trial and is therefore reversible." *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735. First, we determine whether the claimed error is a structural error or a trial error. *Van Kirk*, ¶ 37. A structural error is the type of error "that affects the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Van Kirk*, ¶ 38 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991)). Thus, a structural error is presumptively prejudicial and automatically reversible; it is not subject to harmless error review. *Van Kirk*, ¶¶ 38–39. Trial error, on the other hand, is "the type of error that typically occurs during the presentation of a case to the jury." *Van Kirk*, ¶ 40. The admission of Rogers's irrelevant testimony is the type of error that typically occurs during the presentation of a case to the jury, and is thus trial error.

¶35 Trial error is not presumptively prejudicial and therefore not automatically reversible. *Van Kirk*, ¶ 40. Instead, the analysis proceeds to the second step: determining whether the error was harmless under the circumstances. *Van Kirk*, ¶ 41. We use the cumulative evidence test to determine whether the error was harmless under the circumstances. *Van Kirk*, ¶ 43. The cumulative evidence "test looks not to the quantitative effect of other admissible evidence, but rather to whether the fact-finder was presented with admissible evidence that proved *the same facts as the tainted evidence proved*." *Van Kirk*, ¶ 43 (emphasis in original). If the tainted evidence was admitted to prove an element of an

18

offense, to prove harmless error the State must direct us to the cumulative admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction. *State v. Stewart*, 2012 MT 317, ¶ 46, 367 Mont. 503, 291 P.3d 1187; *Derbyshire*, ¶¶ 47, 54. On the other hand, if the tainted evidence was not admitted to prove an element of the offense, to prove harmless error the State must only demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction. *Stewart*, ¶ 46; *Derbyshire*, ¶¶ 47-48, 54. Under either analysis, when considering the tainted evidence our focus is on the quality of the tainted evidence and its impact on the fact-finder: "the State must show that, *qualitatively*, there is no reasonable possibility the tainted evidence might have contributed to the defendant's conviction." *Derbyshire*, ¶ 54 (citing *Van Kirk*, ¶¶ 34-36, 43) (emphasis in original).

¶36 For purposes of our analysis, we discern from the State's arguments that Rogers's testimony was admitted to prove elements of the charged offense. The State sought to use Rogers's testimony ostensibly to help it establish two elements of the offense: that a crime occurred and that Santillan was the offender. Rogers's testimony assisted the State in neither regard. In addition to having no personal knowledge of the relevant facts, Rogers initially removed the children from Mitch, Danielle, *and* Santillan and thus her decision did not make it more probable that Santillan was the one who actually caused the injuries. Her decision was based on a different inquiry from ascertaining who the offender was. Additionally, the non-accidental nature of A.C.'s injuries was clearly established by the

19

testimony of the physicians. The record reveals that the State provided the jury with a multitude of admissible evidence proving Santillan was the person who caused A.C.'s injuries. Testimony of multiple witnesses, including Santillan himself, established that A.C. was uninjured and acting completely normal when Danielle left for work at 10:30 a.m. on July 11, 2013. Santillan stated he was the only person with A.C. and J.S. from the time Danielle left for work until Santillan alerted Danielle of A.C.'s strange behavior and she returned home. Both Danielle and Santillan testified that Danielle did not hurt A.C. Three doctors testified for the State, and all agreed that the timing of A.C.'s clinical symptoms—sleepiness and vomiting—along with the CAT and MRI results showing a skull fracture and contrecoup injury, meant she was injured within hours of being brought into the hospital. Even the doctor Santillan called as a witness, Dr. Nichols, did not preclude such timing, stating the injury could have occurred within 24 hours or up to a few weeks before A.C. was brought into the hospital, but that A.C.'s clinical symptoms would have occurred within hours of injury. All four doctors agreed that A.C.'s injury was of a serious magnitude; there was no way J.S. could have generated enough force to inflict such a serious skull fracture and resulting brain injury by throwing a toy car at A.C.'s head. Santillan himself acknowledged there was no way A.C. could have sustained her injuries from J.S. throwing the toy car at her head. This admissible evidence proved Santillan was the person who caused A.C.'s injuries, which Rogers's testimony also sought to do.

¶37 Furthermore, the quality of Rogers's testimony regarding removal of the children was such that there was no reasonable possibility that it might have contributed to Santillan's conviction for the precise reason that the testimony is irrelevant. In her own

20

testimony, Rogers provided the very reasons why her testimony did not interfere with the jury's evaluation of the relevant evidence and the witnesses who appeared at trial and testified from personal knowledge. Rogers testified that, while it is her job to investigate child abuse cases, she does not independently have the training or experience to render a medical diagnosis of child abuse. Instead, she relies on what medical professionals tell her and the diagnoses provided by doctors. Rogers testified that she removes children from a parent's care when there is "any suspicion at all that an injury occurred to a child in a home," which is plainly different than proof beyond a reasonable doubt. There is no reasonable probability the testimony contributed to Santillan's conviction because, qualitatively, testimony regarding A.C. and J.S.'s removal did not prove that Santillan caused A.C.'s injuries. Because the record demonstrates an abundance of admissible evidence from which the jury could find that Santillan injured A.C. and because there is no reasonable probability Rogers's testimony contributed to Santillan's conviction, we determine the District Court's error in admitting the testimony was harmless and therefore do not reverse the court's judgment.

¶38 *2. Did the District Court err by ordering Santillan pay restitution for the victim's future psychiatric treatment, counseling, family and marriage counseling, group home care, and case management expenses?*

¶39 Santillan argues the District Court imposed the costs of psychiatric treatment, counseling, family and marriage counseling, and A.C. living at a group home from age 18 to age 60 based on speculative evidence. He contends those restitution amounts should be reversed because the State failed to prove, by a preponderance of the evidence, that the

21

damages were reasonably certain to occur. The State counters that the District Court's restitution order was proper because it is supported by substantial evidence.

¶40 The sentencing judge must require an offender make full restitution to a victim who sustained pecuniary loss. Sections 46-18-201(5) and -241(1), MCA. Pecuniary loss includes "all special damages . . . substantiated by evidence in the record, that a person could recover against the offender in a civil action arising out of the facts or events constituting the offender's criminal activities." Section 46-18-243(1)(a), MCA. Accordingly, restitution "engrafts a civil remedy onto a criminal statute, creating a procedural shortcut for crime victims who would be entitled to a civil recovery against the offender." *Jent*, ¶ 12. A victim is entitled to medical expenses, "expenses reasonably incurred in obtaining ordinary and necessary services that the victim would have performed if not injured," and "future medical expenses that the victim can reasonably be expected to incur as a result of the offender's criminal conduct, including the cost of psychological counseling, therapy, and treatment." Section 46-18-243(1)(a) and (c), MCA.

¶41 We review a district court's findings of fact regarding restitution for clear error: whether the findings are supported by substantial evidence—evidence a reasonable mind might accept as adequate to support a conclusion. *Aragon*, ¶ 9. We must find more than a scintilla of evidence, but do not need to find a preponderance. *Jent*, ¶ 10. The sentencing court must "specify the total amount of restitution that the offender shall pay," § 46-18-244(1), MCA, but the restitution calculation does not necessarily have to be substantiated with documentation. *State v. McMaster*, 2008 MT 268, ¶ 29, 345 Mont. 172, 190 P.3d 302. Even if a victim's actual total loss is uncertain, a restitution award is adequate as long

22

as the loss was derived by use of reasonable methods based on the best evidence available under the circumstances. *State v. Hill*, 2016 MT 219, ¶ 11, 384 Mont. 486, 380 P.3d 768; *Passwater*, ¶ 20; *State v. O'Connor*, 2009 MT 222, ¶ 14, 351 Mont. 329, 212 P.3d 276. It is well understood that there may be "some guess work" in determining the victim's losses, but a restitution award is satisfactory if it is based on the best evidence available. *Passwater*, ¶ 20; *accord O'Connor*, ¶ 14. For example, in *Passwater*, we upheld a restitution award based on a life care plan prepared by "an experienced individual consulting with health care professionals and with outside authority supporting its conclusions." *Passwater*, ¶ 21.

¶42 Based on our review of the record, we conclude that the District Court's findings regarding the restitution order are supported by substantial evidence and therefore the restitution is acceptable. The restitution amount was derived via reasonable methods. A.C.'s needs for psychiatric treatment, counseling, family and marriage counseling, and living at a group home from age 18 to age 60, and the costs associated with each service, were included in the Plan Rau prepared. Rau was a registered nurse with almost 24 years of experience and was a trained legal nurse consultant with experience formulating life care plans. Rau did not prepare A.C.'s Plan alone; she performed research and consulted with Dr. Dichiaro, A.C.'s therapists and teachers, and A.C.'s caregivers. She also met A.C. and observed her in various settings. The Plan independently delineated the cost of each service and explained why the service was necessary.

¶43 The Plan, combined with Rau's testimony, was the best evidence available to determine A.C.'s losses. Rau recognized that A.C.'s losses are uncertain because there is

23

no way to know exactly how much A.C. will improve, if at all, yet Rau used all resources available to her to create a comprehensive Plan. Rau, as an experienced health care professional, performed "some guess work" in determining A.C.'s losses based on the best evidence available to her, which is an understandable and acceptable part of calculating restitution. *See Passwater*, ¶ 20; *O'Connor*, ¶ 14. The Plan and Rau's testimony constitute substantial evidence supporting the District Court's restitution amount.

¶44 Furthermore, Santillan's failure to present any evidence at the sentencing hearing contradicting the State's restitution request is noteworthy. Santillan and his counsel were provided with the Plan well before the sentencing hearing and knew what services and amounts the Plan requested. At the sentencing hearing, Santillan had the opportunity to assert his position and present his own evidence of A.C.'s losses and the associated costs. He, however, did not call any witnesses or present any evidence contradicting the State's requests. Defense counsel argued that the State failed to adequately support the restitution amount, but such arguments do not defeat the fact that Santillan did not present the District Court any contradictory evidence. The District Court only had the State's evidence and testimony in considering the amount of restitution, and such un-contradicted evidence constitutes substantial evidence sufficient to sustain the restitution order.[2] We affirm the District Court's restitution amount in total.

---

[2] Pursuant to § 46-18-246, MCA, "An offender may at any time petition the sentencing court to adjust or otherwise waive payment of any part of any ordered restitution . . . ." If the court finds that "the circumstances upon which it based the imposition of restitution, amount of the victim's pecuniary loss, or method or time of payment no longer exist or that it otherwise would be unjust to require payment as imposed, the court may adjust or waive unpaid restitution . . . ." Section 46-18-246, MCA. Thus, there are remedies available to Santillan should A.C.'s losses not materialize.

**CONCLUSION**

¶45   The District Court improperly admitted irrelevant testimony that the children were removed from Santillan's care, but the error was harmless.  The restitution award for the costs of psychiatric treatment, counseling, family and marriage counseling, and A.C. living at a group home from age 18 to age 60 is adequate because the costs were derived using reasonable methods and the best evidence available under the circumstances.

¶46   Affirmed.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ JIM RICE

25