FILED

02/10/2026

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0608

DA 23-0608

IN THE SUPREME COURT OF THE STATE OF MONTANA

2026 MT 17

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

BILLIE JO HENDERSON,

      Defendant and Appellant,

APPEAL FROM:    District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause No. BDC-22-484
Honorable Elizabeth A. Best, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Ryan Aikin, Aikin Law Office, PLLC, Missoula, Montana

      For Appellee:

      Austin Knudsen, Montana Attorney General, Selene Koepke,
Assistant Attorney General, Helena, Montana

      Joshua Racki, Cascade County Attorney, Amanda Lofink, Deputy
County Attorney, Great Falls, Montana

Submitted on Briefs:  October 29, 2025

Decided:  February 10, 2026

Filed:

_____
Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1 Billie Jo Henderson appeals from her Eighth Judicial District Court jury conviction for felony theft of property valued at over $1,500 but less than $5,000. Henderson asserts the District Court abused its discretion when it allowed the State to introduce text messages between Henderson's co-defendant, Teona Baker, and the complaining witness, Sharen Zeman.[1] The State concedes that the text messages were hearsay and inadmissible but argues the District Court's error in admitting the messages was harmless. The sole issue on appeal is as follows:

> *Whether the District Court's error of allowing the State to present inadmissible hearsay text messages between the complaining witness and co-defendant at trial was harmless.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In October 2021, Henderson moved in with her cousin, Zeman, at Zeman's home in Great Falls, Montana. A few months later, in February or March of 2022, Zeman and Henderson both moved out of Zeman's home and into a home belonging to Roberta Paul, Zeman's aunt. Zeman and Henderson resided together at Paul's home until Henderson's

---

[1] Additionally, Henderson argued in her opening brief that the District Court abused its discretion in denying her motion for new trial which had been based on Cascade County's failure to substantially comply with the jury selection procedures required under § 3-15-405, MCA (2023). However, three weeks after Henderson submitted her opening brief, this Court held in *State v. Hillious*, 2025 MT 53, 421 Mont. 72, 565 P.3d 1218, that a district court does not abuse its discretion in denying a motion for new trial premised on an alleged § 3-15-405, MCA, violation where a defendant fails to demonstrate that the statutory violation affected the random selection of their jury or that the determination of juror excuses, disqualifications, and exclusions were based on subjective criteria. In her reply brief, Henderson concedes that *Hillious* is controlling precedent and that she is unable to demonstrate that Cascade County's errors in the jury selection process affected the random selection of her jury.

partner was released from Montana State Prison in early April 2022, at which point Henderson was asked to move out.

¶3 During the time Henderson and Zeman resided together, Zeman used a storage unit at A1 Eastside Storage of Great Falls to house an array of personal belongings and keepsakes. The lease for the unit, G-25, was in the name of Zeman's daughter, Desaraye Wagner, and paid for by Zeman's husband, Randy Zeman (Randy). Henderson also had a storage unit at this time, though hers was at a different facility located in Black Eagle.

¶4 On April 5, 2022, A1 staff discovered unit G-25 unlocked, prompting staff to review gate code logs and camera footage for any potentially unauthorized access. A1 is a gated storage facility and each storage unit has a unique gate code which is provided to a unit's lessee. The gate code log reviewed by A1 showed that the G-25 code, which had been provided to Wagner as the lessee, was used to access A1 three times on April 4, 2022, between 5:40pm and 10:43pm. A1's surveillance footage showed the first two entries were made by two women in a Chrysler sedan, who were later identified as Henderson and her co-defendant, Teona Baker. After entering through the gate, the women proceeded to unit G-25, which they unlocked using a physical key. Footage showed that both times the women accessed A1, they removed property from G-25 and placed it into the sedan before leaving. Henderson then entered a third time with an unidentified man in a pickup truck. Once again, footage showed Henderson unlocking G-25 with a physical key, then removing property from the unit and placing it in the truck. However, Henderson failed to put the lock back on the unit before leaving, leading to A1's subsequent discovery of the unit being left unsecured on April 5, 2022.

3

¶5 A1 staff contacted Wagner and Randy to inform them about the unit being left unsecured and to inquire about whether the April 4, 2022 access had been authorized. It is unclear when and how Zeman learned about A1's inquiry into G-25's access, but on April 9, 2022, Zeman reported to the Great Falls Police Department that approximately $12,000 of her personal property had been stolen from the unit. Zeman relayed that she believed Henderson and Baker had stolen the property after they entered the unit without her permission on April 4, 2022. Zeman told law enforcement that Henderson had been living with her and had the key to the storage unit because it had been attached to her vehicle keys, which Henderson had taken without permission. Zeman also told law enforcement that she gave Baker the gate code associated with the G-25 unit after Baker called her on April 4, 2022, requesting it so that she could get items out of her boyfriend's unit there.

¶6 On July 25, 2022, the State filed an Information charging Henderson with burglary and theft. Henderson pleaded not guilty and a two-day jury trial commenced on May 23, 2023.

¶7 At trial, Zeman testified that the unit was in her daughter's name and paid for by her husband, but that everything in the unit belonged to either her or her son, Cody Wagner. Zeman also stated that she was the only one with access to the unit, which had been secured with a lock. Zeman testified that the lock for the unit had two keys, one of which was on a key ring with the key fob to her truck, and the other Zeman said, "was with me." Zeman explained that "earlier that day" Henderson had "borrowed [her] truck." Zeman claimed that she asked Henderson to return the keys several times. However, it is unclear when

4

Zeman first requested Henderson to do so; specifically, whether Zeman requested Henderson return the keys prior to Henderson accessing the unit on April 4, 2022. Nevertheless, Zeman emphasized that no one had "the ability or permission to go to the unit without [Zeman]."

¶8 Zeman testified at great length as to the items allegedly stolen from the unit, most of which Zeman testified to purchasing between July 2021 and January 2022. Zeman had compiled a six-page list of missing property along with corresponding values on May 9, 2022, which was admitted as evidence and frequently referenced by the State after Zeman attested to it as a fair and accurate reflection of the items stolen from G-25. Zeman explained that the property values provided were estimated after she went "through a catalog" and "through on the internet" because she "didn't save the receipts on a lot of the items."

¶9 Zeman's list was mostly comprised of clothing items and accessories, which Zeman explained were nearly all brand new and valued at approximately $6,000. Additionally, Zeman listed "1- sm spoons collection (silver) 500 spoons" valued at $2,500,"75 Used + New DVD $7.99-$22.00" valued at $870, "Arts + Craft Stuff" valued at $300, "25 - dog ornaments (glass)" and "25 - assorted glass ornaments" for a total value of $300, "1 - surround sound w/5 speakers" valued at $300, "3 - Chevy Tires (New)" valued at $450, and "1 - Ford F150 Key Fob" valued at $180. Zeman also listed, among other things, "Native Knick Knacks," picture frames, and items gifted to her from friends and relatives who had passed away.

5

¶10    Over objection from defense counsel, a series of text messages between Zeman and Baker was also admitted and frequently referenced by the State.  The exchange took place over Facebook Messenger between Wednesday, April 6, 2022, and Friday, April 8, 2022.  In the first text message, Zeman stated to Baker,

> So when you got that gate code u lied. So you gu[y]s were in my storage[].  Well they got pictures of who was in there and I will be pressing charges.  So let billie jo know.  Plus she has my truck key.  And she stole those to.

Baker responded, "She said that was mostly her clothes I don't know why I believed her."  Baker continued, "She said that. But no I wasn't lying about the gate number I really had to get my shit."  Baker then told Zeman that she would tell Henderson to return Zeman's stuff.

¶11    As the exchange continued, Zeman repeatedly threatened to call the cops.  At one point Baker told Zeman, "If you are calling the cops she said you are going to be in a lot of trouble.  Just relaying the message."  Then, after some items were apparently returned to Zeman, Zeman texted Baker accusing her and Henderson of only returning things that had been "ripped up" and "desecrated."  However, the exchange largely consisted of Zeman sending messages listing various items that were allegedly stolen.  Over twenty of the messages sent by Zeman specifically referenced property Zeman claimed was removed from G-25.  In introducing the messages, the State repeatedly asked Zeman to elaborate on the items referenced and their corresponding values.

¶12    On cross-examination, defense counsel pushed Zeman about the lack of documentation surrounding the value of the property allegedly stolen.  Zeman explained that she purchased every item with cash, rather than check or credit card, so she had no

6

physical documentation of the prices she paid for the items. Zeman was also asked about a text she sent Henderson in November 2021, in which Zeman asked Henderson, "Did you guys go to storage?" While Zeman maintained that she would never give Henderson permission to go to the storage unit without her, Zeman admitted that the text was referencing the G-25 unit. According to Zeman, she had been planning to meet Henderson there when she sent the text but the plan fell through.

¶13 Additionally, on cross-exam, defense counsel asked Zeman if the list was an accurate reflection of the missing items, given that Zeman listed three new Chevy tires as missing, but in an interview the week prior to trial she stated that Henderson took only one tire. After listening to a recording of the interview, Zeman admitted that she had said only one Chevy tire had been taken—not three. Zeman was also pressed about a statement she made in the earlier interview in which she admitted to finding clothing in the storage unit that belonged to an unknown woman. Zeman responded that sometime between the interview and the start of trial she learned that the outfit belonged to her daughter.

¶14 Following Zeman's testimony, the State presented testimony from Rodney Kirkegaard, the manager of A1. Kirkegaard testified to his discovery of the unsecured unit, the gate code data, and the surveillance footage. Kirkegaard explained that while A1 initially had video recordings of both the access gate and the area immediately outside G-25, the footage from outside the G-25 unit never made it onto the flash drive that A1 provided to law enforcement and it had since been deleted. Accordingly, only the footage of the access gate was played for the jury.

¶15    Kirkegaard also testified that he observed two women and a man moving items around outside the G-25 unit on March 25, 2022. When asked if the two women he saw in March were the same who were seen using the G-25 gate code on April 4, 2022, Kirkegaard stated, "It sure appears to be." However, Kirkegaard clarified that he did not see anything taken from the G-25 unit on March 25, 2022. Rather, Kirkegaard explained "there were items outside of the unit. A lot of times, units are so full that they have to move a few items so that they can get in and look around or whatever." Kirkegaard also testified as to what he saw on the footage from outside the G-25 unit from April 4, 2022. Kirkegaard stated that he "could see several things being moved. Definitely some furniture," but he couldn't specifically say tires.

¶16    The State also presented testimony from Officer Kimmet, who responded to Zeman's complaint. Kimmet testified that he watched footage of the A1 gate as well as the footage of the G-25 unit from April 4, 2022. However, like Kirkegaard, Kimmet "really couldn't tell specifics" of what was being taken from G-25. Kimmet stated that he received a list of missing items from Zeman but explained that he did not follow up with any pawnshops or online marketplaces, nor did he ever find the items on Henderson or Baker. In fact, Kimmet testified that he never made contact with Henderson or Baker.

¶17    Following the close of the State's case, Henderson testified in her own defense. Henderson explained that she moved some of her personal belongings into the G-25 unit in October 2021, with Zeman's permission, after she filled her Black Eagle unit. In addition to moving stuff into G-25 in October, Henderson stated that she dropped additional stuff off at the unit with Zeman's son at a later date. Henderson testified that

8

Zeman gave her a key to G-25 so she could access the unit and her belongings, and that the gate code for G-25 was stored in the truck, which Zeman gave her a spare set of keys for. According to Henderson, Zeman was aware that Henderson was using the unit and had no problem with her doing so. Henderson explained that when she went to the unit on April 4, 2022, she believed she had Zeman's permission to access the unit to retrieve her belongings.

¶18    Henderson did acknowledge in her testimony that some of the property removed from G-25 belonged to Zeman. Henderson explained that she "didn't want to take any of [Zeman's] stuff to begin with," but that once she started going through the boxes and totes, she noticed Zeman's "scrap booking kind of stuff," "LED lights," "some clothing," "bathroom stuff," "picture frames and photo albums," and a box of Zeman's "nicknacks or something." According to Henderson, these belongings were, for "the most part," returned to Zeman, though she admitted, "[t]here could have been maybe a couple things that wasn't[,] [b]ut, for the most part, yes, I did bring her stuff back to her." Henderson further testified that she never saw any collection of coins or silver spoons, or any surround sound speakers, or truck tires in the items removed from G-25.

¶19    On cross-examination, the State asked Henderson only two questions. First, the State asked if Henderson was living with Zeman as of April 4, 2022, to which Henderson replied that she was not. Then, the State followed up by asking, "And you never told the police about any of this; correct?" To which Henderson replied, "I did not tell the police about it, due to the fact I was never asked about any of it."

9

¶20     The jury found Henderson guilty of felony theft of property valued over $1,500 but less than $5,000.  The jury did not find Henderson guilty of burglary.

## STANDARD OF REVIEW

¶21     This Court generally reviews a district court's evidentiary ruling for an abuse of discretion.  *State v. Burchill*, 2019 MT 285, ¶ 13, 398 Mont. 52, 454 P.3d 633.  A district court abuses its discretion when it acts arbitrarily without conscientious judgment or exceeds the bounds of reason, resulting in substantial injustice.  *State v. Grimshaw*, 2025 MT 250, ¶ 16, ___ Mont. ___, 578 P.3d 890.  However, to the extent the trial court's ruling is based on an interpretation of an evidentiary rule or statute, the ruling is reviewed de novo.  *State v. Stewart*, 2012 MT 317, ¶ 23, 367 Mont. 503, 291 P.3d 1187.

## DISCUSSION

¶22     *Whether the District Court's error of allowing the State to present inadmissible hearsay text messages between the complaining witness and co-defendant at trial was harmless.*

¶23     The State concedes that the District Court erred in admitting into evidence the text exchange between Zeman and Baker.  However, the State maintains that the error was harmless because the State introduced other evidence the jury could rely on in deciding Henderson was guilty of felony theft of an amount between $1,500 and $5,000.

¶24     We will not reverse a defendant's conviction "unless the record shows that the defendant suffered prejudice by the improper admission of evidence."  *State v. Hunt*, 2025 MT 122, ¶ 48, 422 Mont. 322, 570 P.3d 567.  To determine whether an alleged error prejudiced a criminal defendant's right to a fair trial, this Court conducts a two-step analysis.  *State v. Van Kirk*, 2001 MT 184, ¶ 37, 306 Mont. 215, 32 P.3d 735.  First, we

10

must determine whether the claimed error was a structural error or a trial error. *Van Kirk*, ¶ 37. A structural error is the type of error "that affects the framework within which the trial proceeds, rather than simply an error in the trial itself." *Van Kirk*, ¶ 38 (quoting *Arizona v. Fulminante*, 499 U.S. 279, 310, 111 S. Ct. 1246, 1265 (1991)). "[A] structural error is presumptively prejudicial and automatically reversible; it is not subject to harmless error review." *State v. Santillan*, 2017 MT 314, ¶ 34, 390 Mont. 25, 408 P.3d 130 (citation omitted). Whereas a trial error is "the type of error that typically occurs during the presentation of a case to the jury." *Van Kirk*, ¶ 40. It is not presumptively prejudicial and thus, not automatically reversible. *Van Kirk*, ¶ 40. Accordingly, if the error is a trial error, we must proceed in our analysis by determining whether the error was harmless under the circumstances. *Van Kirk*, ¶¶ 40-43.

¶25 Whether a trial error is harmless depends on the facts of the case. *Grimshaw*, ¶ 25. To establish that an error is harmless, "the State must demonstrate that there is no reasonable possibility that the inadmissible evidence might have contributed to the conviction." *Van Kirk*, ¶ 47. Thus, if the tainted evidence was admitted to prove an element of an offense, "the State must direct us to the cumulative admissible evidence that proves the same facts as the tainted evidence and demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction." *Santillan*, ¶ 35 (citation omitted). "On the other hand, if the tainted evidence was not admitted to prove an element of the offense, to prove harmless error the State must only demonstrate that the quality of the tainted evidence was such that there was no reasonable possibility it might have contributed to the conviction." *Santillan*, ¶ 35. Under

11

either analysis, "our focus is on the quality of the tainted evidence and its impact on the fact-finder: 'the State must show that, *qualitatively*, there is no reasonable possibility the tainted evidence might have contributed to the defendant's conviction.'" *Santillan*, ¶ 35 (quoting *State v. Derbyshire*, 2009 MT 27, ¶ 54, 249 Mont. 114, 201 P.3d 811).

¶26 For the jury to have convicted Henderson of felony theft of property valued between $1,500 and $5,000, the State was required to prove the following elements beyond a reasonable doubt: (1) that Zeman owned the property in question, (2) that Henderson purposely or knowingly obtained or exerted unauthorized control over the property, (3) that Henderson had the purpose of depriving Zeman of the property, and (4) that the value of the property was over $1,500 but under $5,000.

¶27 Here, the State used the text messages to establish all four elements of Henderson's conviction. Specifically, the State used the texts to establish that Baker and Henderson obtained the gate code from Zeman under false pretenses and that Henderson "stole" Zeman's set of keys to obtain unauthorized access to the G-25 unit. The State repeatedly pointed to the text messages to establish that Zeman owned the property in the unit, telling the jury, "[y]ou saw in the text messages with [Baker] those same items that [Zeman] put on the list that were gone," in an effort to validate Zeman's list of missing property. The State also used the texts to assert that Henderson did not return any property other than "ripped up" pictures.

¶28 However, Henderson acknowledged in her testimony that she had unintentionally removed some of Zeman's property from G-25. While Henderson claimed to have returned the property after discovering it, Henderson did admit that "[t]here could have been maybe

12

a couple things that wasn't."  This admission is quality evidence supporting the first three elements of Henderson's felony theft conviction.  However, Henderson's admission does not prove the value of the property in question.

¶29    Further, this case was a credibility contest.  If Henderson's testimony were to be believed, then she did not purposely or knowingly exert unauthorized control over the property in question or act with a purpose of depriving Zeman of property.  Yet, the text messages significantly damaged Henderson's credibility, such that the quality of evidence created a reasonable possibility that it might have contributed to Henderson's conviction.

¶30    In Baker's first text responding to Zeman, Baker stated "[Henderson] said that was mostly her clothes I don't know why I believed her."  Baker's statement labels Henderson a liar and undermines Henderson's entire defense, which was premised on Henderson moving her own belongings out of the G-25 unit.  Further, from the exchange in which Zeman stated to Baker, "[s]o when you got that gate number u lied," and Baker responded, "I wasn't lying about the gate number I really had to get my shit," the jury likely inferred that Baker did in fact get the gate code from Zeman that morning, impermissibly bolstering Zeman's credibility while simultaneously undermining Henderson's claim to have already had the gate code.  Additionally, from Baker's message to Zeman stating, "[i]f you are calling the cops [Henderson] said you are going to be in a lot of trouble," the jury likely inferred Henderson's consciousness of guilt.

¶31    Even acknowledging Henderson's admission that some property had been inadvertently taken and that some property may not have been returned, absent the text messages, there is a reasonable possibility that the jury would not have convicted

13

Henderson of felony theft or would have convicted Henderson of the lesser offense of felony theft of property valued at $1,500 or less. Accordingly, the State has failed to meet its burden in establishing the District Court's error as harmless.

## CONCLUSION

¶32 The District Court erred in admitting text messages between Zeman and Baker which were inadmissible hearsay. Under our harmless error analysis, the District Court's admission of the text messages impermissibly bolstered Zeman's testimony and undermined Henderson's defense as to the charged offenses, and it impermissibly bolstered Zeman's credibility while discrediting Henderson's. The State failed to meet its burden in demonstrating the District Court's error as harmless. Accordingly, we reverse Henderson's conviction for felony theft of property valued at more than $1,500 but less than $5,000 and remand for new trial.

/S/ INGRID GUSTAFSON

We Concur:

/S/ CORY J. SWANSON
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ JAMES JEREMIAH SHEA

14